## Eva K. Kehl v. Louis Burgener et al.

1.  FREEHOLD—*Cross-bill Having as its Object the Taking of a Title from One and Vesting it in Another.*—Where the object of a cross-bill is to take the title of land from one party and vest in another, a freehold is involved and the Appellate Court has no jurisdiction.

2.  MORTGAGES—*Made Before Conveyance of Property and Recorded Afterward.*—The plaintiff conveyed premises to her daughter, who, with the plaintiff's consent and knowledge, gave a mortgage to the defendant to secure notes given to him by her and her mother for loans from time to time. The mortgage was not recorded until after the daughter reconveyed the premises to her mother, but before the recording of the deed of reconveyance. *Held,* that as the mortgage was given with her approval to secure her debt, and was recorded before the record of the deed back to her, it is entitled to precedence, and is a valid lien upon the property.

**Bill to Set Aside a Mortgage.**—Error to the City Court of Aurora; the Hon. RUSSELL P. GOODWIN, Judge presiding. Heard in this court at the October term, 1902. Affirmed. Opinion filed January 27, 1903.

A. C. LITTLE and THEODORE WORCESTER, attorneys for plaintiff in error.

MURPHY, ALSCHULER & NEWHALL, attorneys for defendants in error.

MR. JUSTICE DIBELL delivered the opinion of the court.

On and prior to September 21, 1895, Mrs. Eva K. Kehl was the owner of certain lots and parts of lots in the city of Aurora, on which there were three dwelling houses. On that day she conveyed the premises to her daughter, Elizabeth Kehl, and on September 27, 1895, she executed a second deed to her daughter, to correct an error in the description. These deeds were recorded. The consideration therefor was not money, but some agreement that the daughter would stay with and care for her mother during the rest of her mother's life, and further, as the mother alleges and the daughter denies, would not marry during her mother's life. The main reason for this conveyance seems to have been to place the property beyond any pos-

sible reach of a son, from whom Mrs. Kehl had then been estranged for many years. Thereafter, at the request of her mother, Elizabeth gave a note for $500 to William Tucker, and secured it by a mortgage on the premises. This was a loan secured through Herman Hunt, and it is spoken of in this record as if Hunt were the mortgagee. Under date of July 1, 1896, Elizabeth Kehl gave to Louis Burgener a note for $3,000 payable in twenty years from date, with interest at five per cent per annum payable annually, and secured said note by a mortgage upon a part of the premises her mother had conveyed to her, the date of the instrument and the acknowledgment thereof being July 1, 1896. On August 3, 1896, Elizabeth reconveyed the premises to her mother, by a warranty deed, for the consideration of $1, and subject to $400 of the Hunt mortgage, $100 thereof having been paid. On August 4, 1896, Elizabeth left her home, either voluntarily or else because excluded therefrom by her mother. Elizabeth and Burgener on that day went to the county seat and secured a marriage license, and Burgener filed his mortgage for record, and they returned to Aurora and were married on the evening of that day. On August 12, 1896, the deed from Elizabeth to her mother was recorded. Mrs. Kehl soon after became reconciled to her son, with whom she had had no dealings or communication for sixteen years. Mrs. Kehl had formerly been married to one Michael Kehl, and was divorced from him on March 28, 1883. The evidence indicates that he was not the father of her children, and that her children were born out of wedlock, and that Mrs. Kehl obtained this property, or a considerable part of it, from Michael Kehl at the time she was divorced from him. Mrs. Burgener and her husband, some time after their marriage, went to living with Michael Kehl in his dwelling house, and are taking care of him. Mrs. Kehl and Mrs. Burgener have had no dealings with each other since August 4, 1896. The feeling between the two families is evidently very bitter. On December 11, 1896, Mrs. Kehl began this suit by filing a bill in equity against her daughter and son-in-law, to have the mortgage

for $3,000 to Burgener declared void and set aside as a cloud upon her title. The bill was answered, and Elizabeth Burgener filed a cross-bill against her mother, to have her deed reconveying the premises to her mother declared void and canceled, and to have cross-complainant reinvested with the title. The cross-bill was answered. The cause was heard upon pleadings and proof. The court found Mrs. Kehl the owner of the premises, and the deed from Elizabeth to her valid; and also found the mortgage from Elizabeth to Burgener a valid mortgage, and a lien on the premises described therein; and the court dismissed the bill and the cross-bill. Mrs. Kehl sued out this writ of error to reverse the decree dismissing her bill; and Mrs. Burgener assigns cross-errors upon the action of the court in dismissing her cross-bill. The object of the cross-bill was to take the title from Mrs. Kehl and vest it in Mrs. Burgener. The cross-errors therefore involve a freehold, of which we have no jurisdiction.

Although the burden is upon Mrs. Kehl to overturn the mortgage, it seems most logical to state first the consideration upon which the mortgage is alleged to have been based and the facts and circumstances leading up to it. Burgener claims to have established the following facts: He was a German Swiss. He came to this country in 1888. He brought with him $2,300. He was a jeweler and watchmaker by trade. After living for a short time in two or three other places, he settled in Aurora. The Kehls spoke his language. He soon became acquainted with the mother. In May, 1890, she introduced him to her daughter, and during that month they became engaged to be married, and the engagement continued in force until they were married, August 4, 1896. During that period of time he made to Mrs. Kehl numerous loans, beginning with small sums. These moneys were expended in repairs and improvements upon her dwelling houses, such as papering and painting, and in building an addition containing seven rooms to one of them, practically turning it into a double house, and in building porches, etc. Some of it was

also used to buy for the daughter a patent right for the State of Illinois for a system of dressmaking, which the daughter sought to introduce in different parts of the state, but without substantial success. The women were clothed better after he began to make these loans to them than they had been before. To evidence and secure these loans he took notes signed by the mother and daughter, except that two of the loans were made after the premises were conveyed to the daughter, and for those loans the daughter signed the notes alone; and except that there were a few loans of small sums, aggregating between forty and fifty dollars, for which no notes were taken. In May, 1896, Burgener learned for the first time that Mrs. Kehl had a son with whom she had had nothing to do for many years, and who did not go by her name, but who lived in Aurora and was married. Up to that time Burgener had felt entirely secure with the notes of the mother and daughter, in view of the fact that they owned this considerable property, and that he was to marry the daughter and they were all to live together upon the premises thereafter. In thinking it over, after learning of this son, he began to feel uneasy, fearing that if the mother or daughter should die, the son might claim the property, and dispute these debts, and that he might have trouble. Accordingly, about the middle of June, 1896, he told the women that he wanted a mortgage to secure what was due him upon the property, and this was discussed, and Mrs. Kehl expressed her willingness that her daughter should give the mortgage, but objected to having it placed on record. Pursuant to their conversations on the subject, on July 1, 1896, Elizabeth and Burgener met in the office of John F. Galvin, an attorney and notary public. Burgener produced his notes. Galvin computed the interest upon them. Burgener stated the amounts of the small loans for which no note had been given and they were added in. It was then found that the amount was $239 less than $3,000. During the preceding spring, it had been arranged that the marriage between Elizabeth and Burgener should take place the following

October. Elizabeth then stated that she wanted some money to prepare for her wedding, and it was arranged that Burgener should pay her the $239 for that purpose and she should give her note and her mortgage for the even sum of $3,000, and this was done, and the papers were executed. Galvin, by direction of Burgener, wrote upon each of the nine notes that it was canceled and paid. The new note and mortgage and the old notes were delivered to Elizabeth. There is some discrepancy as to whether the $239 or some part of it was paid to her then, or whether it was paid in the evening. The parties separated. That evening Burgener and Elizabeth met at the home with Mrs. Kehl present, and the notes and new notes and mortgage and the money were there, and the transaction was all gone over, and was approved by Mrs. Kehl, and the old notes and the money were then taken by the daughter and put in a trunk in the house, and the new note and mortgage were delivered to Burgener. The relations between Burgener and Mrs. Kehl had always been friendly, and so continued till the night of August 2d, at which time Burgener and Elizabeth having gone upon the porch because of the heat, Mrs. Kehl locked the door, and resisted all efforts of her daughter to enter until about two o'clock the next morning, when they threatened to get a policeman, and she opened the door and let her daughter in. The next morning, August 3d, she compelled her daughter by the presentation of a revolver, and a threat to kill her, to go to the office of an attorney and execute a deed re-conveying the premises to her mother, which Elizabeth did. The next succeeding morning, August 4th, she compelled her daughter to leave the house, forbidding her ever to return, and Elizabeth carried with her only the clothing she wore and a small hand satchel. Elizabeth then went to Burgener and told him she was expelled, and he thereupon took her to the county seat, recorded his mortgage, got a marriage license, and they returned to Aurora, and were married that evening. They waited some considerable time, hoping for a reconciliation, but none coming, Elizabeth replevied her wearing

apparel and various articles of personal property which were in her mother's house and endeavored to get access to the trunk, for the purpose of getting the money and old notes and other papers, but Mrs. Kehl resisted and the officers did not get them.

Mrs. Burgener was a witness in behalf of her husband, and as she was a party to the suit, it seems to have been assumed that she was competent to testify in his behalf. Our attention is not called to any objection to her testimony. Not only are the facts above stated as claimed by Burgener testified to in the main by both Mr. and Mrs. Burgener, but Galvin also testified in support of the mortgage note. It is argued that his testimony does not distinctly state that the transaction occurred on July 1st, but reading his entire evidence in the record we think it clear he intended so to testify. He stated that a number of notes were produced, signed by Mrs. Kehl and her daughter, and some other notes signed by the daughter alone; that he computed the principal and interest; that something like $40 was added to it, and that the total fell more than $200 short of $3,000, and that by the direction of the parties, the papers were drawn for $3,000 and the difference was to be paid to Elizabeth in money, and that she took the papers away with her, to hold until the money was paid to her. In favor of the mortgage having been executed upon July 1st, is also the official certificate of acknowledgment by Galvin as a notary public, which is dated on that day. If this transaction was not what it appears on the face of the papers, then either Burgener and Elizabeth forged Mrs. Kehl's name to a number of notes, or Galvin conspired with them to testify falsely on this trial, without any motive so to do disclosed by the evidence.

The claims in opposition to the mortgage are as follows : Mrs. Kehl in her testimony denied that Burgener ever paid any attention to her daughter, of any kind, until about the last of June, 1896. Mrs. Kehl opposed his attentions. She denied she ever borrowed a dollar of money of Burgener or ever gave him any note, or ever consented to the execu-

tion of the $3,000 note and the mortgage securing it. She testified that all the improvements she put upon her property were paid for with money she herself earned, except the $500 she borrowed from Hunt, $100 of which she returned. She claimed that when her daughter left the house, she really did so voluntarily; that her daughter had been packing up for a week, and that she told her if she intended to go, she might as well go and not come back. It is the theory of Mrs. Kehl's counsel that this note and mortgage were not drawn on July 1, 1896, but on August 4th, after her daughter had left the house, and on the day she married Burgener, and that the purpose thereof was to cloud her title, and cheat and defraud her.

Besides her own positive testimony in denial, Mrs. Kehl produced various witnesses to corroborate her story. To show that Burgener was not paying attentions to her daughter prior to June, 1896, and that they were not engaged prior to that time, she produced various neighbors who had never seen Burgener go to the house. She proved by various witnesses that during that period her daughter told them she never intended to marry, or never intended to marry during her mother's life. She proved that in June, 1890, the next month after Burgener and Elizabeth claim this engagement to marry was made between them, Burgener was arrested on a charge of bastardy, on the complaint of one Mary Channon; that after being in jail over Sunday he married her; that the woman had a child, which died, and Burgener refused to pay its funeral expenses on the ground he had no money; and that he was divorced from her in 1892. Mrs. Kehl also called a woman who was a fortune teller, and who testified that Elizabeth told her that she became engaged to Burgener in June, 1896. To support her claim that there was no indebtedness owing to Burgener, Mrs. Kehl called the clergyman who married Burgener and Elizabeth, and the clergyman's wife. They testified that after this suit was begun, they sought to restore the family peace, and after visiting Mrs. Kehl, they called upon Mr. and Mrs. Burgener, and asked them why

the mortgage was given, and that nothing was said to them about any indebtedness, but that Burgener and his wife stated that the mortgage was given on account of this son of Mrs. Kehl, and from the fear that he who had been away from his mother so many years, might, at her death, seek to get the property, to the injury of the daughter, who had always stayed with her mother, and had been a dutiful child, and helped to earn and save the property, etc. According to the testimony of the clergyman and his wife, they asked no questions about money or an indebtedness, and that subject was not discussed, although the clergyman said he remembered Burgener did say something about having assisted the family a little but did not remember that any amount was stated. The reply to this testimony is that the existence of the son was in truth and fact the reason why Burgener called for a mortgage, he having theretofore been satisfied with the notes of the woman whom he was to marry and of her mother, whom they expected to make her home with them the rest of her life. It ought to be stated here that Burgener denied that he was the father of the Channon woman's child, or had ever had illicit intercourse with her, and claimed he married her to get out of jail, and that he never lived with her; and that Elizabeth testified she was cognizant of the circumstances, and still continued her engagement with Burgener. The evidence is very voluminous, and it would be impracticable to set out all the details in this opinion. Each side has brought out many circumstances in the proof confirmatory of its theory of the truth. Counsel for Mrs. Kehl lay great stress upon the fact that Burgener collected no interest on these various notes he claims to have had; that he reduced the interest from seven per cent to five in the new note, and made the principal run for twenty years. Burgener's counsel argue it was not unnatural that he should not desire any speedy payment of the money, when he was going to marry the daughter, to whom the property had been conveyed, and to live with her upon the premises. They call attention to the fact that Mrs. Kehl herself tes-

tified that in 1892 or 1893 Burgener was on such terms of intimacy with her that he was at her house consulting her about some business affair, and she was advising him what to do. Defendants called several witnesses who testified Mrs. Kehl had boasted to them that she had compelled her daughter, at the point of a revolver, to re-deed the property to her, and introduced other testimony tending to show that Mrs. Kehl was a woman of violent and ungovernable temper.

There is clearly a very great conflict in the testimony. Its consideration has, however, led us to the conclusion that the preponderance of the proof supports the claim of Burgener that he did make these loans, and that this mortgage was given with the approval of Mrs. Kehl, to secure a *bona fide* indebtedness for the amount named therein; and that, though it was recorded after the execution of the deed back to Mrs. Kehl, still it was given with her approval to secure her debt, and was recorded before the record of the deed back to her, and is entitled to precedence, and is a valid lien upon the property. The decree, so far as it sustains the mortgage and dismisses the original bill, is therefore affirmed.